**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **In re:** | ) | **Chapter 11** |
| **MTPC, LLC, *et al.*,[1]** | ) | **Case No. 20-5438 (RSM)** |
| **Debtors.** | ) | **Judge Randal S. Mashburn** |
| | ) | **(Joint Administration Requested)** |

**DECLARATION OF MARK ANDREWS,**
**MANAGING DIRECTOR AT TRINITY RIVER ADVISORS**
**AND RESTRUCTURING ADVISOR TO THE DEBTORS IN SUPPORT OF THE**
**DEBTORS' CHAPTER 11 PETITIONS AND FIRST-DAY MOTIONS**

I, Mark Andrews, hereby declare, under penalty of perjury, that:

1. I am the Chief Restructuring Officer ("CRO") of MTPC, LLC d/b/a Provision CARES Proton Therapy Center Nashville, a limited liability company organized under the laws of Tennessee ("MTPC"), The Proton Therapy Center, LLC d/b/a Provision CARES Proton Therapy Center Knoxville, a limited liability company organized under the laws of Tennessee ("PCPTK"), and PCPT Hamlin, LLC d/b/a Provision CARES Proton Therapy Center Orlando, a limited liability company organized under the laws of Florida ("PCPT Hamlin") (collectively, the "Company," the "Debtors," or the "Centers"). I have served in that role since November 4, 2020. Since that time, I have assumed many responsibilities, including handling or overseeing financial modeling, liquidity management, and general day-to-day operations. As a result, I am generally

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, include: MTPC, LLC (5340) ("MTPC"); The Proton Therapy Center, LLC (4209) ("PCPTK"); PCPT Hamlin, LLC (3848) ("PCPT Hamlin"). The Debtors' service address is: 1400 Dowell Springs Boulevard, Suite 350, Knoxville, TN 37909-2447.

familiar with the Debtors' most recent day-to-day operations, businesses, financial affairs, books and records, and restructuring efforts.

2.    Except as otherwise indicated herein, all facts set forth in this Declaration are based on my personal knowledge, my discussions with the Debtors' management team, professionals, advisors, my review of relevant documents and information concerning the Debtors operations, financial affairs, and restructuring initiatives, or my opinions based on my experience and knowledge. I am over the age of eighteen and authorized to submit this declaration on behalf of the Debtors. If called on to testify, I could and would testify competently to the facts set forth in this Declaration.

3.    I received my bachelor's degree from Georgetown University in 1980 and my juris doctorate from Tulane University in 1983. I am a lawyer licensed to practice law in Texas and the District of Columbia and admitted to practice in several Federal District Courts and Bankruptcy Courts. I have over 35 years of legal experience in all aspects of debt restructuring and acquisition and sales of companies in distress. I have advised banks, borrowers, and others with Chapter 11 and out-of-court restructurings. I primarily represented Chapter 11 debtors and occasionally represented lenders, creditors' committees, and buyers during the latter two-thirds of my career. I have authored articles on bankruptcy law, served on the State Bar of Texas Bankruptcy Section Board, served as a Master in the John C. Ford Inn of Court, and am admitted as a Fellow in the American College of Bankruptcy. I was a named partner in a Dallas-based bankruptcy boutique and served as the head of the bankruptcy section at Cox Smith, continuing in that role at Dykema, an AmLaw 200 firm, until my retirement in July 2020. I am currently a managing director of Trinity River Advisors ("Trinity"). I was previously appointed Trustee in a Chapter 11 bankruptcy

case and have been trained as a mediator and have mediated bankruptcy cases and related adversaries.

4. I initially became aware of the instant matter when I was asked to represent certain service-provider affiliates; however, the engagement was not completed before my retirement in July 2020. Thereafter, I was asked to consider the role of CRO.

5. While I have been involved in the Debtors' restructuring process (the "Restructuring Process"), I have, without limitation, (a) participated in the development, negotiation, and implementation of various strategic and tactical alternatives for restructuring, reducing, or modifying the Debtors' indebtedness, (b) managed professionals engaged by the Debtors in connection with the Restructuring Process, and (c) supervised the preparation of documentation needed to implement the Restructuring Process, (d) reviewed the financial condition of each Debtor, including reviewing balance sheets, budgets, and underlying key contracts, (e) assisted the negotiation of recapitalization, sales, or other transactions, (f) worked with an investment banker and other sales agents, (g) managed discussions regarding capital investments, (h) coordinated all restructuring efforts, (i) participated in management and lender meetings, and (j) advised and consulted with the company on these issues and others.

6. I have reviewed the condition of each of the Company and believe that the Chapter 11 filings are necessary under the circumstances here, including, in particular, the inability to service the debt owed to the bondholders and insufficient capital on a long-term basis to carry out the purposes for which the Company operates. I submit this Declaration to assist the Court and parties-in-interest in understanding the circumstances that compelled the commencement of these chapter 11 cases and in support of the Debtors' Chapter 11 petitions filed with the Court on the

date hereof, and the various emergency "first-day" relief that the Debtors have requested pursuant to the motions and pleadings filed with this Court.

7. On December 15, 2020, (the "Petition Date"), the Debtors filed voluntary petitions (the "Petitions") for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"), commencing the above-captioned cases (collectively, the "Chapter 11 Case(s)"), in an effort to preserve and maximize the value of their Chapter 11 estates (collectively, the "Estates").

8. The Debtors intend to operate their businesses and to manage their properties as debtors-in-possession under §§ 1107(a) and 1108 of the Bankruptcy Code.

9. The Debtors have requested certain relief in "first-day" applications and motions filed with the Court (singularly, a "First-Day Motion," and collectively, the "First-Day Motions")[2] to minimize potential adverse impacts of the bankruptcy filings and to maximize the value of their Estates.

10. I am familiar with the contents of each First-Day Motion (including the exhibits) and the facts set forth therein are true and correct to the best of my knowledge. The relief sought in each First-Day Motion will provide an orderly transition of the Debtors into these Chapter 11 Cases and ultimately permit the Debtors to maximize recoveries for all parties-in-interest. Further, I believe the relief sought in the First-Day Motions is in each case narrowly tailored and necessary to achieve the goals identified above and in each motion, and, accordingly, best serves the interests of the Estates and their stakeholders.

[2]Capitalized terms not defined herein have the meanings ascribed to them in the applicable First-Day Motion.

## I. OVERVIEW

### A. The Debtors' Businesses.

11. The Debtors are non-profit companies, two are operating individually as full-service proton therapy and cancer-treatment centers, and one is being developed as the same. As non-profit companies, the Debtors are devoted to the health and well-being of their regional communities by providing exceptional care to their patients. The Debtors have provided, collectively, more than 100,000 treatments since they opened their doors.

12. As of August 31, 2020, MTPC's unaudited financial statements reflected total assets of approximately $105,600,000 and total liabilities of approximately $131,200,000, PCPTK's unaudited financial statements reflected total assets of approximately $93,400,000 and total liabilities of approximately $130,200,000, and PCPT Hamlin's unaudited financial statements reflected total assets of approximately $139,200,000 and total liabilities of approximately $138,500,000.

13. The Debtors have commenced these Chapter 11 Cases to implement a comprehensive financial restructuring with three (3) core objectives: (a) deleveraging the Debtors' balance sheets; (b) ensuring that the Debtors can continue to provide leading cancer and healthcare solutions to their patients; and (c) engaging with their creditors to maximize value for all stakeholders.

14. The Debtors intend to move swiftly through the Chapter 11 Cases and address these issues in a focused and constructive manner without disruption to their operations to continue to provide services necessary for patient care and to avoid negative outcomes for their patients, most of whom have serious illnesses that require daily therapy without interruption. The Debtors intend to negotiate a consensual restructuring with their creditor constituencies, which will be

memorialized in a plan of reorganization. For this reason, the Debtors request expedited treatment of the First-Day motions so that there is minimal disruption to patient care.

15. In advance of filing these Chapter 11 Cases, the Debtors commenced negotiations with their major stakeholders.

16. In summary, the Debtors currently have sufficient liquidity to fund their operations through the pendency of the Chapter 11 Cases and expect operations to continue in the normal course throughout the Chapter 11 Cases.

17. Each Debtor is a limited liability company. Two operate full-service proton therapy and cancer-treatment centers, and one is developing a full-service proton-therapy and cancer-treatment center. MTPC operates the facility in Nashville, Tennessee. PCPTK operates the facility in Knoxville, Tennessee, and PCPT Hamlin is developing the facility in Winter Park (Hamlin), Florida. The Debtors operate vertically-integrated companies in cancer care with connections between the cancer-care provider, systems and technology, operator, and developer (noting that the facility operated by PCPTK utilizes a treatment system from a third party, IBA).

18. The Debtors employ a next-generation proton-therapy system using external beam radiotherapy along with innovative healthcare solutions focused on improving patient care and clinical outcomes for cancer patients. Conventional x-ray therapy deposits energy along the entire path of the beam when entering and exiting the tumor site, which damages healthy organs and tissues of a patient. The proton therapy provided by the Debtors is non-invasive treatment that precisely targets cancerous and non-cancerous tumors and reduces the risk of side effects to surrounding healthy tissue.

19. The Debtors use the most precise form of proton therapy, called "Pencil Beam Scanning," which allows physicians to target the tumor area with the highest radiation dose by a

proton beam only millimeters wide, thus controlling both the depth and the position of the beam, and planning the exact point at which the proton beam stops inside the body. This allows doctors to spare healthy organs and bodily tissue from unnecessary radiation exposure while treating tumors and diseased tissue. This approach has been shown to improve the quality of life for patients both during and after treatment and may lead to reduced patient side effects, fewer patient treatments, improved local cancer control, and improved quality of life for the patient, and shorter treatment times.

20. Generally speaking, the Centers work with doctor's groups, marketers, and patient outreach to generate sufficient leads to keep operating. Each Center can treat up to an estimated 90 patients per day. Pre-COVID, the Centers reached an average of 43 patients a day at MTPC and 66 patients a day at the PCPTK; PCT Hamlin has not yet opened.

21. Proton therapy costs more than radiation. Yet, advocates of proton therapy, and there are many, believe that its advantages in lessening collateral damage outweigh that cost disadvantage. As a general proposition, proton therapy costs about $32 million per treatment room (Nashville has 3 treatment rooms, Knoxville has 5 rooms, but 2 are used more for research and development and 3 are used for treatment). The computing system costs about 8 million per room. For clarity though, the use of the old technology is not advisable in certain clinical settings (head and neck, child and or certain other treatments are more often the province of proton therapy).

22. PCPTK was the first proton therapy cancer treatment center in Tennessee, second in the Southeast, and 13th in the nation. Building on the success of the PCPTK, MTPC established a proton therapy cancer treatment center in Nashville in 2018. PCPT Hamlin has been constructing a proton therapy center in the Hamlin community, just outside of Orlando, Florida, since December, 2018.

23. Due to financial difficulties, PCPT Hamlin has been unable to secure the majority of the equipment necessary to complete its proton therapy center. It is uncertain when the Hamlin proton therapy center will be operational.

24. The operations of the Centers are supported by certain sister companies: specifically, ProVision Health Partners, LLC ("PHP"); Provision Healthcare, LLC ("PVH"); Provision Solutions, LLC ("PVS") and ProNova Solutions, LLC ("ProNova" and collectively with PHP, PVH and PVS, the "Service Providers"). PHP provides billing and collection services for the Knoxville and Nashville proton centers and general and administrative services for all the entities. PVH owns approximately 65% of ProNova, which is the company that designed, manufactured and maintains the proton therapy treatment system utilized by MTPC and which is intended to be utilized by PCPT Hamlin once development of the Hamlin proton center is complete. PVH is the sole owner of PVS, which provides development services for the construction of the Hamlin proton center, as well as clinical training, marketing, and other services for the proton centers in Knoxville and Nashville. Approximately 70% of PVH is owned by Vision Investments, LLC, which was organized by Dr. Terry Douglass. The Centers are non-profit entities for federal and state income-tax purposes and the Service Providers are for-profit entities for federal and state income-tax purposes.

25. The Debtors employ one person, Mary Lou Dubois, whose compensation exceeds the priority limit for employee compensation under § 507(a)(4). That employee has a senior leadership position and a job that entails, among other things, oversight of operations, marketing, planning, and development as well as the liaison with doctors and healthcare professionals. This employee has primary responsibility for operations at all three centers – two that are operating and one that is not operating. This employee's compensation is within a reasonable range of

compensation, given my experience and expertise, and is approved by the bond holders of the bonds discussed in detail below.

26. PCPTK maintains a contractual relationship with Provision Medical Group, Platinum Oncology and Excelsior Physicians, which are separate medical practice owned by physicians. PCPTK has a professional services agreement with each of the physician groups. Tennessee Oncology is the largest oncology group in Tennessee and has a large presence in Nashville. MTPC has a professional services agreement with Tennessee Oncology, Provision Medical Group, PLLC, Platinum Oncology, PLLC and Excelsior Physicians, PC and MTPC maintains a contractual relationship with Tennessee Oncology to ensure their patients receive unparalleled care and comfort from experienced radiation oncologists and staff. Some of the medical groups may provide nurse practitioners as well as radiation oncologists, but medical physicists, dosimetrists, etc. are employed directly by the Debtors.

**B. Financial Problems.**

27. From the beginning, the Debtors experienced difficulties in meeting their obligations.

28. As of the Petition Date, there was approximately $108.8 million in principal amount outstanding on the Series 2014 Knoxville Bonds.

29. As of the Petition Date, there was approximately $113.7 million in principal amount outstanding on the Secured Series 2017 Nashville Bonds; approximately $5.0 million in principal amount outstanding on the Subordinate Series 2017 Nashville Bonds; and approximately $5.0 million in principal amount outstanding on the Unsecured Series 2017 Nashville Bonds.

30. As of the Petition Date, there was approximately $135.5 million in principal amount outstanding on the Series 2018 Orlando Bonds, spilt between Senior Secured Notes of $125.5 million and Subordinated Notes of $10.0 million.

31. Due to lower than projected reimbursement rates and patient volume, PCPTK and MTPC have not been able to service the bond debt and have also been essentially relying on a subsidy of credit terms from the Service Providers. As a result, the Service Providers built up a receivable of $10.4 million from PCPTK and MTPC. That caused the Service Providers to have difficulty paying their own vendors, including their primary lender, ServisFirst Bank. While the Centers were stretched, they kept paying the bondholders current until November 2019. Shortly thereafter matters worsened. COVID made patients reluctant to seek diagnosis or treatments. At PCPTK, the patient count went down from a daily total of 66 to 47, and PCPTK's earnings dropped from $2,045,751 to $1,486,416 on a monthly basis. At MTPC, the patient count went down from a daily total of 43 to 24, and MTPC's earnings dropped from $1,598,549 to $895,771 on a monthly basis.

32. Adding to these difficulties, the Centers were hit with a cyberattack in late October 2020, crippling their essential computer systems and financial-reporting capabilities. That attack rendered some data temporarily inaccessible, amplifying an already tight cash situation.

33. PCPT Hamlin has suffered, too. It was under construction during this period, and its progress payments fell short of what was required to complete the entire equipment list. While the building is substantially complete and has a certificate of occupancy, the equipment installation and fabrication is not yet complete.

**C. The Debtors' Corporate Structure.**

34. The chart on the following page illustrates the Debtors' basic organizational structure in summary form:



**(1) PCPTK.**

35.     PCPTK is a Tennessee limited liability company that was organized in 2010. The majority member of PCPTK is Provision Trust, Inc., a Tennessee nonprofit corporation ("Provision Trust"). All members of PCPTK are nonprofit entities. Each of PCPTK and Provision Trust have received a determination letter from the Internal Revenue Service indicating that they are exempt from federal-income taxation as provided by Section 501(a) of the Internal Revenue Code of 1986, as amended (the "IRC") by virtue of its status as an organization described in Section 501(c)(3) of the IRC. PCPTK is a proton-therapy cancer-treatment center that serves a multi-state area of the Southeastern United States and began operations in 2014. The State of Tennessee has Certificate of Need ("CON") requirements for proton-therapy cancer-treatment facilities that require the TN Health Services and Development Agency's approval prior to commencement of operations. In May 2010, the PCPTK received a CON from the State of Tennessee. PCPTK is located in an 88,000 square-foot building on the campus of the Provision

CARES Cancer Center at Dowell Springs, a comprehensive healthcare campus focusing on cancer treatment, patient care, research, and education. PCPTK is a freestanding center with three active treatment rooms including one fixed beam and two gantries.

36. The various rights and obligations of its members are set forth in the Operating Agreement of The Proton Therapy Center, LLC dated February 5, 2010, as amended by the First Amendment to the Operating Agreement of The Proton Therapy Center, LLC. The members and their ownership percentages are: (a) Provision Trust, Inc. at 82.5%; (b) Issachar Fund (8.5%); (c) Provision Foundation, Inc. (7.0%); and (d) Provision CARES Foundation, Inc. (2.0%).

37. PCPTK is governed by a board of directors consisting of five members. The current members of the Board of Directors are: (a) Terry Douglass, (b) James Blankemeyer, (c) Michael Crabtree, (d) Scott Hamilton, and (e) Daryl Heald. Mary Lou DuBois is PCPTK's president.

**(2) MTPC, LLC.**

38. MTPC is a Tennessee limited liability company that was organized in 2014. The members of MTPC are nonprofit organizations and consist of Provision Trust (48%), Issachar Fund (26%) and Provision CARES Foundation, Inc. (26%). MTPC and Provision Trust have each received a determination letter from the Internal Revenue Service indicating that they are exempt from federal-income taxation as provided in Section 501(a) of the IRC by virtue of its status as an organization described in Section 501(c)(3) of the IRC. MTPC is a proton-therapy cancer-treatment center that serves a multi-state area of the Southeastern United States and began operations in 2018. In June 2015, MTPC received a CON from the State of Tennessee. MTPC is located in a 43,500 square-foot building adjacent to the campus of the Williamson Medical Center. MTPC is a freestanding center with three active treatment rooms including one fixed beam and two gantries.

39. The various rights and obligations of its members are set forth in the Operating Agreement of MTPC dated January 6, 2015. The members and their ownership percentages are: (a) Provision Trust at 48.0%; (b) Provision Foundation, Inc. (26.0%); and (c) Provision CARES Foundation, Inc. (26.0%).

40. MTPC is governed by a board of directors consisting of four members. The current members of the Board of Directors are: (a) Terry Douglass, (b) Michael Crabtree, (c) Scott Hamilton, and (d) Robert Ratze. Mary Lou DuBois is MTPC's president.

**(3) PCPT Hamlin, LLC.**

41. PCPT Hamlin is a Florida limited liability company that was organized in 2018. The sole member of PCPT Hamlin is Provision Trust. PCPT Hamlin and Provision Trust have each received a determination letter from the Internal Revenue Service indicating that each is exempt from federal income taxation as provided in Section 501(a) of the IRC by virtue of its status as an organization described in Section 501(c)(3) of the IRC. PCPT Hamlin will include an approximately 36,700 square foot building in the 900-acre Hamlin planned development in the "Town Center" of the 23,000 acre "Horizon West" planning area of West Orange County. PCPT Hamlin will be a freestanding center with three active treatment rooms including one fixed beam and two gantries

42. The various rights and obligations of its members are set forth in the Operating Agreement of PCPT Hamlin, LLC dated August 6, 2018. Provision Trust is the sole member of PCPT Hamlin.

43. PCPT Hamlin is governed by a board of managers consisting of three members. The current members of the Board of Managers are: (a) Terry Douglass, (b) Michael Crabtree, and (c) Daryl Heald. Mary Lou DuBois is PCPT Hamlin's president.

### D. Debt Structure By Corporation.[3]

#### (1) PCPTK.

##### (a) Long-Term Debt For PCPTK.

44. Pursuant to a Master Trust Indenture dated as of August 1, 2014, between PCPTK as the Initial Obligated Group Member and U.S. Bank National Association, as Master Trustee (the "PTC Master Trustee"), as supplemented and amended by a Supplemental Master Trust Indenture, dated August 1, 2014 (as amended and/or supplemented from time to time, the "PTC Master Trust Indenture"), and that certain Indenture of Trust dated as of August 1, 2014 (the "PTC Bond Trust Indenture"), The Health, Educational and Housing Facility Board of the County of Knox (the "Knoxville Issuer") issued $129,595,000 in Revenue Bonds, in two separate series (the "Series 2014 Knoxville Bonds").

45. Pursuant to the PTC Master Trust Indenture, the PTC Obligated Group (as defined below) executed and delivered to the PTC Master Trustee concurrently with the issuance of the Series 2014 Knoxville Bonds, the Series 2014 Note (the "Series 2014 Note") issued pursuant to PTC Master Trust Indenture.

46. The proceeds of the Series 2014 Knoxville Bonds were loaned to PCPTK pursuant to a Loan Agreement dated as of August 1, 2014, between the Knoxville Issuer and PCPTK (the "PTC Loan Agreement"). PCPTK used the proceeds of the Series 2014 Knoxville Bonds to: (a) refinance certain outstanding debt that originally was used to acquire, construct and equip the Knoxville Center, (b) finance improvements to the Knoxville Center, (c) finance capitalized interest, (d) fund a debt service reserve fund, and (e) finance costs of issuance.

[3]The following summary is qualified in its entirety by reference to the operative documents, agreements, schedules, and exhibits. In the event of inconsistency between this summary (including the defined terms therein), the source documents shall control and govern.

47. Pursuant to the PTC Master Trust Indenture, the PTC Loan Agreement, and the Deed of Trust, Security Agreement, Assignment of Rents and Leases and Fixture Filing executed and delivered by PCPTK, as a Grantor, the PTC Master Trustee was granted a security interest in, among other things, all of PCPTK's right, title and interest in: (a) certain real property listed therein (the "Knoxville Real Property"); (b) all buildings improvements and fixtures of every kind, and all machinery, equipment and property that are or shall be attached, or be deemed to be fixtures and a part of such Knoxville Real Property; (c) all equipment, materials, supplies and other property of every kind or nature whatsoever, now or hereafter owned by PCPTK or in which it has or shall have an interest, procured for incorporation in or to be affixed to buildings or other improvements on the subject Knoxville Real Property or appurtenant thereto; (d) all furniture, furnishings, equipment, and other items of tangible personal property now owned or in which PCPTK has an interest or hereafter acquired by PCPTK that are used or useful in the buildings or other improvements on such Knoxville Real Property; and (e) all rentals, income, issues and profits that may accrue from the aforesaid land and improvements or any part thereof (the "Knoxville DOT Collateral").

48. The PTC Master Indenture also provides for security interest in favor of the PTC Master Trustee in "all receipts, revenues, income and other monies received by or on behalf of" any member of the Obligated Group, and all rights to receive the same and all proceeds of such rights (the "Knoxville Receipts," and collectively with the Knoxville DOT Collateral, the "Pre-Petition Knoxville Collateral").

49. On or about April 15, 2020, UMB Bank, National Association ("UMB") replaced U.S. Bank National Association, as the PTC Master Trustee.

50. Long-term debt includes Revenue Bonds (Provision Center for Proton Therapy Project), Series 2014 by The Health, Educational and Housing Facilities Board of the County of Knox, Tennessee, in two Series: $75,630,000 on August 14, 2014 ("Series 2014A") and $53,965,000 on August 14, 2014 ("Series 2014B"). As of December 7, 2020, the outstanding amounts owed under Series 2014A were approximately $75.6 million, and the outstanding amounts owed under Series 2014B were approximately $37.7 million. Details of each are as follows:

| | |
|---|---|
| Revenue bond, Series 2014 A, payable with interest at 6.00% due in annual principal payment ranging from $6,580,000 to $10,490,000 and semi-annual interest payments ranging from $314,700 to $2,268,900 from June 2025 through May 2034, collateralized by personal and real property. | $75,630,000 |
| Revenue bond, Series 2014 B, payable with interest at 5.25% due in annual principal payment ranging from $3,750,000 to $6,255,000 and semi-annual interest payments ranging from $2,433,094 to $3,685,481 through May 2025, collateralized by personal and real property. | $37,745,000 |

**(b) Line of Credit for PCPTK.**

51. PCPTK has an operating line of credit with Provision Trust, Inc. with a maximum borrowing limit of $6,000,000, collateralized by personal and real property. As of December 7, 2020, the outstanding balance payable to Provision Trust, Inc. was approximately $5.2 million.

**(c) Related-Party Transactions.**

52. PCPTK receives dosimetry and medical physics services from PVS. As of December 7, 2020, PCPTK owes PVS approximately $684,503 for these services (including marketing services). PCPTK also has a billing and management services agreement with PHP for services provided to PCPTK. As of December 7, 2020, PCPTK owes PHP approximately $8,812,769 for these services (including IT support).

**(2) MPTC.**

**(a) Long-Term Debt For MPTC.**

53. Pursuant to a Master Trust Indenture dated as of June 1, 2017, between MTPC as the Obligated Group Representative and U.S. Bank National Association, as Master Trustee (the "MTPC Master Trustee"), as supplemented and amended by a Supplemental Master Trust Indenture, dated June 1, 2017 (as amended and/or supplemented from time to time, the "MTPC Master Trust Indenture"), and that certain Indenture of Trust dated as of June 1, 2017 (the "MTPC Bond Trust Indenture"), The Health and Educational Facilities Board of the City of Franklin (the "Nashville Issuer") issued $113,660,000 in Revenue Bonds, in a series of senior bonds in the principal amount of $108,660,000 (the "Secured Series 2017 Nashville Bonds"); and a series of subordinate bonds in the aggregate principal amount of $5,000,000 (the "Subordinate Secured 2017 Nashville Bonds" and together with the Secured Series 2017 Nashville Bonds, the "Secured Series 2017 Nashville Bonds"). The Nashville Issuer also issued on June 7, 2017, two series of subordinate unsecured bonds in an aggregate principal amount of $5,000,000 (the "Unsecured Series 2017 Nashville Bonds").

54. Pursuant to the MTPC Master Trust Indenture, the MTPC Obligated Group (as defined below) executed and delivered to the MTPC Master Trustee concurrently with the issuance of the Series 2017 Nashville Bonds, the Series 2017 Note (the "Series 2017 Note") all issued pursuant to the MTPC Master Trust Indenture.

55. The proceeds of the Series 2017 Nashville Bonds were loaned to MTPC pursuant to a Loan Agreement dated as of June 1, 2017, between the Nashville Issuer and MTPC (the "MTPC Loan Agreement"). MTPC used the proceeds of the Series 2017 Nashville Bonds to: (a) refinance certain outstanding debt that originally was used to acquire, construct and equip the

Nashville Center, (b) finance improvements to the Nashville Center, (c) finance capitalized interest, (d) fund a debt service reserve fund, and (e) finance costs of issuance.

56. Pursuant to the MTPC Master Trust Indenture, the MTPC Loan Agreement, and the Deed of Trust, Security Agreement, Assignment of Rents and Leases and Fixture Filing executed and delivered by MTPC, as Grantor, the MTPC Master Trustee was granted a security interest in, among other things, all of MTPC's right, title, and interest in: (a) certain real property listed therein (the "Nashville Real Property"); (b) all buildings improvements and fixtures of every kind, and all machinery, equipment and property that are or shall be attached, or be deemed to be fixtures and a part of such Nashville Real Property; (c) all equipment, materials, supplies and other property of every kind or nature whatsoever, now or hereafter owned by MTPC or in which it has or shall have an interest, procured for incorporation in or to be affixed to buildings or other improvements on the subject Nashville Real Property or appurtenant thereto; (d) all furniture, furnishings, equipment and other items of tangible personal property now owned or in which MTPC has an interest or hereafter acquired by MTPC that are used or useful in the buildings or other improvements on such Nashville Real Property; and (e) all rentals, income, issues and profits that may accrue from the aforesaid land and improvements or any part thereof (the "Nashville DOT Collateral").

57. The MTPC Master Indenture also provides for security interest in favor of the MTPC Master Trustee in "all receipts, revenues, rentals, income, insurance proceeds (including, without limitation, all Medicaid, Medicare and other third party payments), condemnation awards and other moneys received by or on behalf of" any member of the Obligated Group, and all rights to receive the same and all proceeds of such rights (the "Nashville Gross Revenues," and

collectively with the Nashville DOT Collateral, the "Prepetition Nashville Collateral"). The Secured Series 2017 Nashville Notes have the benefit of the Prepetition Nashville Collateral.

58. On or about April 15, 2020, UMB replaced U.S. Bank National Association, as the MTPC Master Trustee.

59. Long-term debt includes Revenue Bonds (Provision CARES Proton Therapy Center, Nashville Project), Series 2017 by The Health and Educational Facilities Board of the City of Franklin Revenue Bonds and consists of the following three Series issued on June 7, 2017:

| | |
|---|---|
| Senior Revenue bond, Series 2017A, payable with interest rates ranging from 6.5% to 7.5% due in annual principal payments ranging from $1,290,000 to $8,865,000 and semi-annual interest payments ranging from June 2017 through June 2047, collateralized by personal and real property ("Series 2017A"). | $108,660,000 |
| Subordinate Revenue bond, Series 2017B, payable with interest at 7.5% due in annual principal payments ranging from $55,000 to $410,000 and semi-annual interest payments from June 2017 through June 2047, collateralized by personal and real property ("Series 2017B"). | $5,000,000 |
| Subordinated Unsecured Revenue bond, Series 2017C, payable with interest at 7.75% due in annual principal payments ranging from $25,000 to $235,000 and semi-annual interest payments from June 2017 through June 2047, unsecured ("Series 2017C"). | $5,000,000 |

60. As of December 7, 2020, (a) the outstanding amounts owed under Series 2017A were approximately $108.6 million, (b) the outstanding amounts owed under Series 2014B were approximately $5.0 million, and (c) the outstanding amounts owed under Series 2014C were approximately $5.0 million.

**(b) Related-Party Transactions.**

61. MPTC has an agreement with ProNova for the purchase of a three-room proton therapy system at a price of $43,650,000. This purchase was originally financed in 2016 partially with bonds purchased by Provision Healthcare, LLC. Proceeds from the issuance of the bonds in

Note 5 were used to repay the 2016 bonds in 2017. The total amount paid to ProNova for proton equipment was approximately $2,137,000 in 2018. As part of the agreement, MPTC received $4,000,000 from ProNova for not meeting the agreed timeline. MPTC also entered an agreement with ProNova for operation and maintenance of the proton equipment. As of December 7, 2020, MTPC owes ProNova approximately $0 for operation and maintenance services. MPTC has an agreement with PVS for certain development and training services for a total of $7,000,000. As of December 7, 2020, PVS also provides certain support services to MPTC on an ongoing basis and MTPC currently owes approximately $1.5 million to PVS for these services (including marketing support). MPTC has a billing and management services agreement with PHP for services provided to MPTC. As of December 7, 2020, MPTC owes approximately $1.3 million to PHP for these services (including IT support).

**(3) PCPT Hamlin.**

**(a) Long-Term Debt For PCPT Hamlin.**

62. Pursuant to a Master Trust Indenture dated as of October 1, 2018, between PCPT Hamlin, as the Initial Obligated Group Member and U.S. Bank National Association, as Master Trustee, as supplemented and amended by two separate Supplemental Master Trust Indenture, each dated October 1, 2018 (as amended and/or supplemented from time to time, the "PCPT Hamlin Master Trust Indenture"), and that certain Indenture of Trust dated as of October 1, 2018 (the "PCPT Hamlin Bond Trust Indenture"), the Capital Trust Agency (the "Orlando Issuer") issued $135,470,000 in Revenue Bonds, in a series of senior bonds in the principal amount of $125,470,000 (the "Senior Series 2018 Orlando Bonds") and a series of subordinate bonds in the

principal amount of $10,000,000 (the "Subordinate Series 2018 Orlando Bonds" and together, the "Series 2018 Orlando Bonds").

63. Pursuant to the PCPT Hamlin Master Trust Indenture, the PCPT Hamlin Obligated Group (as defined below) executed and delivered to the PCPT Hamlin Master Trustee concurrently with the issuance of the Series 2018 Orlando Bonds, the Series 2018A Note and a Subordinate Series 2018B Note (together, the "Series 2018 Notes") each issued pursuant to the PCPT Hamlin Master Trust Indenture.

64. The proceeds of the Series 2018 Orlando Bonds were loaned to PCPT Hamlin pursuant to a Loan Agreement dated as of October 1, 2018, between the Orlando Issuer and PCPT Hamlin (the "PCPT Hamlin Loan Agreement"). PCPT Hamlin used the proceeds of the Series 2018 Orlando Bonds to: (a) finance the acquisition, construction, and equipping of the Orlando Center, (b) finance capitalized interest, (c) fund a debt-service-reserve fund, and (d) finance costs of issuance.

65. Pursuant to the PCPT Hamlin Master Trust Indenture, the PCPT Hamlin Loan Agreement, and the two separate Mortgage, Assignment of Leases and Rents, Fixture Filing, and Security Agreement executed and delivered by PCPT Hamlin, as Grantor, the PCPT Hamlin Master Trustee was granted a security interest in, among other things, all of the PCPT Hamlin's right, title, and interest in: (a) certain real property listed therein (the "Hamlin Real Property"); (b) all buildings improvements and fixtures of every kind, and all machinery, equipment and property that are or shall be attached, or be deemed to be fixtures and a part of such Hamlin Real Property; (c) all equipment, materials, supplies and other property of every kind or nature whatsoever, now or hereafter owned by PCPT Hamlin or in which it has or shall have an interest, procured for incorporation in or to be affixed to buildings or other improvements on the subject Hamlin Real

Property or appurtenant thereto; (d) all furniture, furnishings, equipment and other items of tangible personal property now owned or in which PCPT Hamlin has an interest or hereafter acquired by PCPT Hamlin that are used or useful in the buildings or other improvements on such Hamlin_Real Property; and (v) all rentals, income, issues and profits that may accrue from the aforesaid land and improvements or any part thereof (the "Orlando Mortgaged Collateral").

66. The PCPT Hamlin Master Indenture also provides for security interest in favor of the PCPT Hamlin Master Trustee in "all receipts, revenues, rentals, income, insurance proceeds (including, without limitation, all Medicaid, Medicare and other third party payments), condemnation awards and other moneys received by or on behalf of" any member of the Obligated Group, and all rights to receive the same and all proceeds of such rights (the "Orlando Gross Revenues," and collectively with the Orlando Mortgaged Collateral, the "Prepetition Orlando Collateral" and collectively with the Prepetition Knoxville Collateral and the Prepetition Nashville Collateral, the "Prepetition Collateral").

67. On or about April 15, 2020, UMB replaced U.S. Bank National Association, as the PCPT Hamlin Master Trustee.

68. Long-term debt includes Revenue Bonds, Series 2018 by the Capital Trust Agency Revenue Bonds (Provision CARES Proton Therapy Center, Orlando Project) issued on November 7, 2018 in two Series:

| | |
|---|---|
| Senior Revenue bond, Series 2018A, payable with interest rates ranging from 7.0% to 7.5% due in annual principal payments ranging from $2,165,000 to $11,015,000 and semi-annual interest payments ranging from October 2019 through October 2048, collateralized by personal and real property ("Series 2018A"). | $125,470,000 |
| Subordinate Revenue bond, Series 2018B, payable with interest at 8% due in annual principal payments ranging from $1,695,000 to $2,330,000 and semi-annual interest payments from October 2019 through October 2053, collateralized by personal and real property ("Series 2018B"). | $10,000,000 |

69. As of December 7, 2020, (a) the outstanding amounts owed under Series 2018A were approximately $125.0 million, and (b) the outstanding amounts owed under Series 2018B were approximately $5.0 million.

## II. EVENTS LEADING TO THESE CHAPTER 11 CASES

70. Each Debtor has defaulted on its respective bond debt because of certain events described below.

### (1) PCPTK.

71. PCPTK has faced financial challenges during the course of its operations due to lower-than-projected patient volumes and reimbursement rates from commercial insurers. To enable PCPTK to meet its financial covenants under the bond-financing documents and sustain sufficient working capital for operations, several entities that provide support services (the "PCPTK Service Providers"), including billing, accounting, human resources, information technology, legal and marketing services, have allowed PCPTK to defer payments.

72. Changes to Medicare reimbursement rates that were proposed in 2019 and implemented in 2020 eliminated other sources of revenue for the PCPTK Service Providers, and to meet their own financial obligations, the PCPTK Service Providers have been unable to provide continued capital support to PCPTK.

73. In addition to the lack of continued capital support from the PCPTK Service Providers, PCPTK's financial position has been adversely impacted by the COVID-19 crisis. PCPTK's operating costs have increased due to measures taken to ensure the safety of its patients and clinical staff. At the same time, PCPTK's patient volumes have decreased as many cancer patients with compromised immune systems elected to defer proton therapy treatment, if possible, until the crisis subsides.

74. Most recently, PCPTK was a victim of a malware attack that encrypted its computer servers. PCPTK was unable to treat patients for a few days, but it has taken longer than expected to completely restore its business operations. In particular, PCPTK's accounting department was unable to bill insurers for patient treatments for a period of approximately four weeks following the malware attack. While PCPTK should ultimately receive revenue generated during this period, the delayed billing cycle has exacerbated PCPTK's financial difficulties for the near term.

75. As a result of the foregoing, PCPTK is unable to meet its financial obligations under the bond financing documents and unable to meet many of its other financial obligations as they become due.

**(2) MTPC.**

76. MTPC has faced financial challenges during the course of its operations due to lower-than-projected patient volumes and reimbursement rates from commercial insurers. To enable MTPC to meet its financial covenants under the bond-financing documents and sustain sufficient working capital for operations, several entities that provide support services (the "MTPC Service Providers"), including billing, accounting, human resources, information technology, legal and marketing services, have allowed MTPC to defer payments.

77. Changes to Medicare reimbursement rates that were proposed in 2019 and implemented in 2020 eliminated other sources of revenue for the MTPC Service Providers, and to meet their own financial obligations, the MTPC Service Providers have been unable to provide continued capital support to MTPC.

78. In addition to the lack of continued capital support from the MTPC Service Providers, MTPC's financial position has been adversely impacted by the COVID-19 crisis. MTPC's operating costs have increased due to measures taken to ensure the safety of its patients and clinical staff. At the same time, MTPC's patient volumes have decreased as many cancer

patients with compromised immune systems elected to defer proton therapy treatment, if possible, until the crisis subsides.

79. Most recently, MTPC was a victim of a malware attack that encrypted its computer servers. MTPC was unable to treat patients for a few days, but it has taken longer than expected to completely restore its business operations. In particular, MTPC's accounting department was unable to bill insurers for patient treatments for a period of approximately four weeks following the malware attack. While MTPC should ultimately receive revenue generated during this period, the delayed billing cycle has exacerbated MTPC's financial difficulties for the near term.

80. As a result of the foregoing, MTPC is unable to meet its financial obligations under the bond financing documents and unable to meet many of its other financial obligations as they become due.

**(3) PCPT Hamlin, LLC.**

81. PCPT Hamlin is currently under development in Hamlin, a mixed-use project within Orange County, Florida's Horizon West planning area and was financed with tax-exempt bonds issued by Capital Trust Agency, a public agency organized under the laws of the State of Florida.

82. PCPT Hamlin's building is substantially complete but completion and installation of the proton-therapy system is behind schedule due to financial challenges faced by the equipment manufacturer, ProNova. ProNova's financial difficulties stem from changes to Medicare reimbursement rates that were proposed in 2019 and implemented in 2020. These proposed changes eliminated financing for new domestic proton-therapy projects that ProNova anticipated as revenue sources for 2019 and 2020. Additionally, ProNova's financial position has been adversely impacted by the COVID-19 crisis, which has delayed development and funding for projects in Asia and Europe.

83. As a result of the foregoing, ProNova is currently unable to complete the proton-therapy system. Without the proton-therapy system, PCPT Hamlin is unable to open for patient treatments and, therefore, generate revenue to meet its financial obligations under the bond-financing documents.

84. Notwithstanding the Debtors' efforts to cut costs and enhance revenues, the combination of the aforementioned macro issues and the significant debt burden resulted in the Debtors defaulting on their Bond obligations and the realization that the long-term viability of the treatment center required a reduction of its debt load to a more-manageable amount.

## III. FIRST-DAY MOTIONS

85. Concurrently with the filing of the chapter 11 petitions, the Debtors filed a number of First Day Motions seeking relief that the Debtors believe is necessary to enable them to transition into the Chapter 11 Cases, preserve enterprise value, and advance a course that serves both the interests of creditors and parties in interest as well as their mission. The Debtors request that each First Day Motion be granted, as each constitutes a critical element in achieving a successful transition to chapter 11.

86. For a more detailed description of the relief requested in the First Day Motions, the Debtors respectfully refer the Court, creditors, and other parties in interest to the respective First Day Motion.

87. As described more fully below, the relief requested in the First-Day Motions was carefully tailored by the Debtors, in consultation with their professionals, to ensure that the Debtors' immediate operational needs are met, and that the Debtors will suffer no immediate and irreparable harm.

88. At all times, the Debtors' management and professionals will remain cognizant of the limitations imposed on debtors-in-possession. In light of these limitations, the Debtors

narrowed the relief requested at the outset of the Chapter 11 Cases to only issues that require urgent relief to sustain the Debtors' operations.

**A. Administrative and Procedural Motions.**

***(1) Debtors' Emergency Motion for Limiting Notice and Establishing Additional Notice Procedures (the "Limiting Notice Motion").***

89. The Debtors seek entry of an order establishing certain case management and notice procedures. The specific requests are explained below.

90. Limitation of Notice. The Debtors seek the authority to file a separate 20 largest general unsecured creditors list for each of the Debtors and a consolidated creditor matrix for all three of the Debtors. A consolidated list of 20 largest general unsecured creditors, for each of the Debtors, together with a consolidated creditor matrix, will help alleviate administrative burdens, costs, and duplication.

91. Patient Data. In addition, the Bankruptcy Code and the need to protect patient data are somewhat at odds with each other. Bankruptcy requires transparent disclosure of data to interested parties and constituencies. But federal law mandates that patient data be maintained as private. The procedures proposed in the Case Management Motion balance the paramount interests of safeguarding confidential patient information with the disclosure requirements set forth in the Bankruptcy Code relating to creditors and parties in interest. Specifically, in light of the impracticality of providing individual notice to each of the Debtors' hundreds of current and former patients, the Debtors propose to serve the Commencement Notice, via regular mail, on all Patient Claimants, and by publication as soon as practicable following the entry of an order granting this Motion. This will not only avoid confusion among creditors, but will prevent the Debtors' estates from incurring unnecessary costs associated with serving multiple notices to the parties listed on the Debtors' voluminous creditor matrix. I believe the proposed procedures adequately

balances the interest of transparency and disclosure with the requirement to protect confidential patient information.

92. General. In addition, the Debtors request to limit notice with regard to certain routine motions. Bankruptcy Rule 2002 as well as applicable local rules set forth the requirements as to notice. These requirements allow the Court to authorize certain exceptions. While the Debtors support fulsome notice in most cases, some routine motions are of little interest except to directly affected parties, and the service of the same may be expensive. Where the notices are predominantly electronic, the Debtors will continue to provide such notice on each motion. However, where notice is required by mail or special delivery, Debtors ask this court to tailor notice so that their costs do not outweigh the benefits. I believe that this requested notice limitation is in the best interests of the Estates, their creditors, and all other parties in interest and constitutes a critical element in achieving a successful and smooth transition to chapter 11. Accordingly, on behalf of the Debtors, I respectfully submit that this motion should be granted.

***(2) Debtors' Emergency Motion For Entry Of An Order (I) Authorizing Consolidated Creditor Lists, (II) Authorizing Redaction Of Certain Personal Identification Information, (III) Approving The Form And Manner Of Notifying Creditors Of The Commencement Of The Chapter 11 Cases And Other Information (the "Consolidated Creditors List Motion")***

93. The Debtors seek entry of an order consolidating the creditor list for the Debtors, authorizing redaction of certain information and approving the form and manner of notifying creditors of the commencement of these Chapter 11 Cases.

***(3) Debtors' Emergency Motion for Entry of an Order Extending Time to File Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules of Executory Contracts and Unexpired Leases, and Statements of Financial Affairs (the "Schedule-Extension Motion")***

94. The Debtors seek entry of an order extending their deadlines to file the bankruptcy schedules and statements of financial affairs to January 31, 2021. As stated above, Debtors were

victimized by a cyberattack on or about October 26, 2020. Active restoration and security work has been ongoing since that date. In addition, the Debtors have significant and complex financial dealings. As a result, given the current status of the active restoration, our focus on patient safety and welfare, and our desire to provide correct and timely financial reporting, the Debtors ask this Court for an extension to file schedules and statements of financial affairs to January 31, 2021.

95. I believe that the extension requested is in the best interests of the Estates, their creditors, and all other parties in interest and constitutes a critical element in achieving a successful and smooth transition to chapter 11. Accordingly, on behalf of the Debtors, I respectfully submit that the Schedule-Extension Motion should be granted.

**(4) *Debtors' Emergency Motion for Entry of an Order Directing Joint Administration of Cases Pursuant to Bankruptcy Code Section 302, Bankruptcy Rule 1015(b) and Waiving Requirements of Bankruptcy Code Section 342(c)(1) and Bankruptcy Rules 1005 and 2002 (n) (the "Joint Administration Motion").***

96. The Debtors seek entry of an order directing joint administration of these Chapter11 Cases for procedural purposes only, pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure and Rule 9075-1 of the Local Rules of the United States Bankruptcy Court for the Middle District of Tennessee (the "Local Bankruptcy Rules"). Specifically, the Debtors request that the Court maintain one file and one docket for the Chapter 11 Cases under the lead case, MTPC, LLC. Further, the Debtors request that an entry be made on the docket of each of the Chapter 11 Case to indicate the joint administration of the Estates.

97. Given the provisions of the Bankruptcy Code and the Debtors' common relationships, joint administration of these Chapter 11 Cases is warranted. Joint administration will avoid the preparation, replication, service and filing, as applicable, of duplicative notices, applications, and orders, thereby saving the Debtors considerable expense and resources.

98. The Debtors' financial affairs and business operations are closely related. Many of the motions, hearings, and orders in the Chapter 11 Cases will affect each Debtor and its respective estate. Creditors will not be adversely affected, because this Motion requests only administrative and not substantive consolidation of the Estates.

99. Moreover, each creditor may still file its claim against a particular Estate. In fact, all creditors will benefit by the reduced costs that will result from the joint administration of the Chapter 11 Cases. The Court also will be relieved of the burden of entering duplicative orders and maintaining duplicative files.

100. Finally, supervision of the administrative aspects of the Chapter 11 Cases by the Office of the United States Trustee for the Middle District of Tennessee will be simplified.

101. I believe that the relief requested in the Joint Administration Motion is in the best interests of the Estates, their creditors, and all other parties in interest and constitutes a critical element in achieving a successful and smooth transition to chapter 11. Accordingly, on behalf of the Debtors, I respectfully submit that the Joint Administration Motion should be granted.

***(5) Emergency Motion Of Debtors' for Entry of Interim and Final Orders Authorizing The Debtors To (I) Continue To Operate Their Cash Management Systems; (II) Maintain Their Bank Accounts; (III) Honor Certain Prepetition Obligations Related Thereto And (Iv) Waiving The Requirements Of Section 345(B) Of The Bankruptcy Code (the "Claims Agent Retention Application").***

102. The Debtors seek the entry of an order employing and retaining Bankruptcy Management Solutions, Inc. d/b/a Stretto ("Stretto") to act as the claims and noticing agent and to assume full responsibility for, among other things, the distribution of notices and the maintenance, processing, and docketing of proofs of claim filed in the Chapter 11 Cases.

103. I am generally familiar with the rates and service quality of other claims and noticing agents and believe that Stretto's rates are competitive and reasonable given Stretto's quality of services and expertise.

104. In view of the number of anticipated claimants and the complexity of the Debtors' businesses, I submit that the appointment of a claims and noticing agent will provide the most effective and efficient means of, and relieve the Debtors and the Office of the Clerk of the Bankruptcy Court of the administrative burden of, noticing, administering claims, and soliciting and balloting votes, and is in the best interests of the Estates and their creditors. Accordingly, on behalf of the Debtors, I respectfully submit that the Claims Agent Retention Application should be granted.

**B. Operational Motions Requesting Immediate Relief.**

***(1) Emergency Motion for Entry of Interim and Final Orders: (A) Authorizing the Debtors to Pay Certain Prepetition (I) Wages, Salaries and Other Compensation, (II) Reimbursable Employee Expenses, and (III) Employee Medical and Similar Benefits; (B) Confirming that the Debtors May Continue Prepetition Employee Programs and Pay Employees in the Ordinary Course of Business; and (C) Directing Banks and Other Financial Institutions to Honor all Related Checks and Electronic Payment Requests (the "Wages and Benefits Motion").***

105. The Debtors seek authority to pay and honor, in the ordinary course of business and in their sole discretion, prepetition claims and obligations related to: (a) Unpaid Compensation, (b) Uncashed Checks, (c) Deductions and Payroll Taxes, (d) Reimbursable Expenses, and (e) the Employee Benefit Programs, all as defined and described in the Wages and Benefits Motion, including authority to retain their current Executives and continue to compensate them on the ordinary course of business.

106. If the requested relief is not granted, the Debtors' relationships with their employees would be adversely impacted and there could well be irreparable harm to the employees' morale, dedication, confidence and cooperation.

107. The Debtors' business hinges on their relationships with their employees and, in turn, the relationship with the Debtors' patients. The employees' support for the Debtors' restructuring efforts is critical to the success of these Chapter 11 Cases.

108. At this early stage, the Debtors simply cannot risk the substantial damage to their businesses that would inevitably attend any decline in their employees' morale attributable to the Debtors' failure to pay wages and commissions, salaries, benefits and other similar items.

109. I believe that the relief requested in the Wages and Benefits Motion is in the best interests of the Estates, their creditors, and all other parties in interest and constitutes a critical element in achieving a successful and smooth transition to chapter 11. Accordingly, on behalf of the Debtors, I respectfully submit that the Wages and Benefits Motion should be granted.

***(2) Emergency Motion of Debtors for Entry of Interim and Final Orders Authorizing (I) Debtors to Pay Certain Prepetition Taxes and Fees and (II) Granting Related Relief (the "Taxes and Fees Motion").***

110. The Debtors seek entry of an order (a) (i) authorizing, but not requiring, the Debtors, in their sole discretion, to pay the Taxes and (b) authorizing the Banks to receive, process, honor and pay checks or wire transfers used by the Debtors to pay such Taxes.

111. In connection with the normal operations of their businesses, the Debtors collect, withhold and incur the Taxes described in the Taxes and Fees Motion and remit those Taxes to various Governmental Authorities. The Debtors remit the Taxes through checks and electronic transfers that the Banks process.

112. For a variety of reasons (all as more fully set forth in the Taxes and Fees Motion), the Debtors believe that, in an exercise of their sound business judgment, requesting the authority

to pay the Taxes and Other Taxes and Fees is necessary to permit a value-maximizing outcome in these Chapter 11 Cases. As discussed in the Taxes and Fees Motion, the Debtors must continue to pay Taxes to continue operating and to avoid costly distractions during these Chapter 11 Cases.

113. I believe that the relief requested in the Taxes and Fees Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and constitutes a critical element in achieving a successful and smooth transition to chapter 11. Accordingly, on behalf of the Debtors, I respectfully submit that the Taxes and Fees Motion should be granted.

***(3) Emergency Motion of Debtors' for Entry of Interim and Final Orders Authorizing the Debtors to (I) Continue to Operate Their Cash Management Systems; (II) Maintain Their Bank Accounts; (III) Honor Certain Prepetition Obligations Related Thereto and (IV) Waiving the Requirements of Section 345(b) of the Bankruptcy Code (the "Cash Management Motion").***

114. The Debtors seek entry of an order authorizing the Debtors to (a) maintain the existing Bank Accounts and business forms and continue to use their existing Cash Management System, (b) granting administrative priority to intercompany claims and (c) waiving the requirements of section 345(b) of the Bankruptcy Code.

115. The Cash Management System maintained by the Debtors has been designed to: (i) provide an efficient method of collecting, transferring and disbursing funds; (ii) establish procedures and controls necessary to account for funds in an accurate manner; and (iii) facilitate meeting the Debtors' financial obligations. The Debtors' Cash Management System includes the necessary accounting controls to enable the Debtors, as well as other interested parties in these cases, to trace funds through the system and ensure that all transactions are adequately documented and readily ascertainable.

116. Without the requested relief, including approval of the intercompany transactions and authority to use existing business forms, all as more fully described in the Cash Management Motion, the Debtors may suffer undue disruptions to the Debtors' business operations and jeopardize the success of these Chapter 11 Cases.

117. I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and constitutes a critical element in achieving a successful and smooth transition to chapter 11. Accordingly, on behalf of the Debtors, I respectfully submit that the Cash Management Motion should be granted.

***(4) Emergency Motion of Debtors' for Entry of Interim and Final Orders (I) Authorizing the Debtors to: (A) Maintain Existing Insurance Coverage and Existing Insurance Premium Financing Agreements, (B) Satisfy all Prepetition Obligations Related to that Insurance Coverage in the Ordinary Course of Business, and (C) Renew, Supplement, or Enter into New Insurance Coverage in the Ordinary Course of Business, and (II) Granting Related Relief (the "Insurance Motion").***

118. The Debtors seek entry of an order authorizing the Debtors to (a) continue insurance coverage entered into prepetition and satisfy prepetition obligations related thereto; (b) renew, amend, supplement, extend, or purchase Insurance Policies; (c) honor the terms of the Premium Financing Agreements and pay premiums thereunder; and (d) enter into new Premium Financing Agreements in the ordinary course of business.

119. The Insurance Policies provide coverage for, among other things, the Debtors' property, general liability, medical professional liability, automobile liability, excess umbrella liability, directors' and officers' liability, network privacy and security liability, employer's liability and flood insurance. The Debtors finance premiums for certain of their Insurance Policies because it is not economically advantageous for the Debtors to pay the premiums on the Financed Policies, in full, on a lump-sum, quarterly, or monthly basis.

120. Continuation of the Debtors' Insurance Policies, and entry into new insurance policies, is essential to the preservation of the value of the Debtors' business and operations. Accordingly, to ensure uninterrupted coverage, the Debtors request authority to maintain their existing Insurance Policies, pay any prepetition obligations related thereto, honor their obligations under the Premium Financing Agreements, and enter into new Insurance Policies in the ordinary course of business.

121. The Debtors believe that all material amounts related to the Insurance Policies that were due and payable on or prior to the Petition Date have been fully paid but, out of an abundance of caution and to avoid irreparable harm to their businesses, the Debtors seek authority to satisfy any such prepetition obligations through the Insurance Motion.

122. I believe that the relief requested in the Insurance Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and constitutes a critical element in achieving a successful and smooth transition to chapter 11. Accordingly, on behalf of the Debtors, I respectfully submit that the Insurance Motion should be granted.

***(5) Debtors' Emergency Motion for Entry of Interim and Final Orders: (I) Prohibiting Utilities from Altering, Refusing or Discontinuing Service; (II) Deeming Utility Companies Adequately Assured of Future Performance; and (III) Establishing Procedures for Determining Requests for Additional Adequate Assurance (the "Utilities Motion").***

123. The Debtors seek entry of interim and final orders (a) determining that the Debtors' proposed offer of deposits, as set forth herein, provides Utility Companies with adequate assurance of payment within the meaning of section 366 of the Bankruptcy Code, (b) approving procedures for resolving requests by Utility Companies for additional or different assurances beyond those set forth in this Motion, and (c) prohibiting the Utility Companies from altering, refusing or discontinuing any utility services on account of

prepetition amounts outstanding or on account of any perceived inadequacy of the Debtors' proposed adequate assurance.

124. Uninterrupted utility services are essential to the Debtors' ongoing operations.

125. Should any utility company refuse or discontinue service, even for a brief period, the Debtors' operations could be severely disrupted. The impact of this disruption on the Debtors' day-to-day business operations and revenue would be extremely harmful and could jeopardize the value of the Debtors' assets.

126. I believe that the relief requested in the Utilities Motion is in the best interests of the Debtors' estates, their creditors and all other parties in interest and constitutes a critical element in achieving a successful and smooth transition to chapter 11. Accordingly, on behalf of the Debtors, I respectfully submit that the Utilities Motion should be granted.

***(6) Debtors' Emergency Motion For Entry Of Interim And Final Orders (I) Authorizing The Payment Of Certain Prepetition*** *Taxes* ***And Fees And (II) Granting Related Relief (the "Taxes Motion").***

127. The Debtors seek interim and final orders authorizing the payment of certain prepetition taxes and fees. As the Debtors comprise a healthcare system, the need for immediate relief is particularly important to not only preserve the status quo while transitioning into Chapter 11 but moreover, to reassure patients that their care and wellbeing are not at risk. The relief sought in this Motion is necessary to avoid immediate and irreparable harm and ultimately in the best interests of all creditors, employees, patients, and other parties-in-interest

***(7) Debtors' Emergency Motion for Entry of Interim and Final Orders Authorizing the Debtors to Use Cash Collateral, Granting Adequate Protection and Scheduling a Final Hearing (the "Cash Collateral Motion").***

128. The Debtors seek entry of an order (i) authorizing the Debtors' use of cash collateral (as defined in section 363(a) of the Bankruptcy Code, "Cash Collateral"); (ii) providing adequate protection to parties who may have a security interest in the Cash Collateral for any diminution in the value of their interest in the Cash Collateral; (iii) scheduling a final hearing (the "Final Hearing") to consider the relief requested in the Motion and the entry of a Final Order; and (iv) approving the form of notice with respect to the Interim Order and the Final Hearing.

129. Through the Cash Collateral Motion, the Debtors seek the authority to use Cash Collateral during the interim period necessary to avoid immediate and irreparable harm. The need for immediate relief is particularly important not only to preserve the status quo of the Debtors' proton therapy centers while transitioning into Chapter 11, but also to reassure patients that their care and wellbeing is not at risk. Absent prompt authority to continue to use Cash Collateral, the value of the Debtors' enterprise would diminish, which pales in comparison to the harm that would result from being unable to continue providing exceptional care to patients.

130. The Debtors propose to use Cash Collateral during the Chapter 11 Cases in the ordinary course of the Debtors' business to meet their postpetition obligations, prepetition obligations as authorized by the Court, to pay their general and administrative operating expenses, and other necessary costs and expenses, including without limitation,

U.S. Trustee fees, professional fees and expenses, taxes and insurance incurred during the pendency of the Chapter 11 Cases.

131. In exchange for their use of Cash Collateral, the Debtors are offering Adequate Protection in the form of replacement liens on the Debtors' assets, solely to the extent of any diminution in the value from and after the Petition Date of the Bond Trustee's interest in Prepetition Collateral resulting from the Debtors' postpetition use and the imposition of the Automatic Stay.

132. It has also been explained to me that the Cash Collateral Motion includes requests for customary relief, such as approval of a Carve-Out for payment of post-petition professional fees and expenses, and for the payment of U.S. Trustee fees in the Chapter 11 Cases during the interim period, as well as modifications to the Automatic Stay to the extent necessary to implement and effectuate the terms and provisions of the Orders.

133. The Debtors' continued use of Cash Collateral during the Chapter 11 Cases will allow the Debtors to maximize the value of their estates and enhance creditor recoveries for all parties-in-interest, while also providing for uninterrupted patient care and serving the public interest. I believe the use of Cash Collateral during the Chapter 11 Cases is of critical importance.

134. The Debtors are cautiously optimistic that the Lien Holder will consent to the Debtors' use of Cash Collateral on an interim basis by the time of the hearing on the Cash Collateral Motion. Nevertheless, assuming such consent is not secured, I believe that the Adequate Protection offered to the Lien Holder will sufficiently protect the Lien Holder from any diminution in value during the limited interim period.

135. In light of the forgoing, I respectfully submit that the Cash Collateral Motion be granted on an interim basis to allow the Debtors to transition into these Chapter 11 Cases, continue providing exceptional care to their patients, and preserve value for creditors and other parties in interest.

## IV. CONCLUSION

136. In conclusion, for the reasons stated herein and in each of the First-Day Motions filed concurrently or in connection with the commencement of the Chapter 11 Cases, I respectfully request that each of the First-Day Motions be granted in its entirety, together with such other and further relief as this Court deems just and proper.

[*Signature Page Follows*]

Pursuant to 11 U.S.C. § 1746, I declare under penalty of that the foregoing is true and correct. Executed on December 12, 2020.

Respectfully Submitted,

Mark Andrews
Chief Restructuring Officer

4827-2917-2925.10